JOSEPH F. BIANCO, United States District Judge
Plaintiffs Division 1181 Amalgamated Transit Union-New York Employees Pension Fund and its trustees Michael Cordiello and Stanley Brettschneider (collectively, "plaintiffs" or "the Fund") commenced this action for withdrawal liability against defendants Logan Transportation Systems, Inc. ("LTSI"), Logan Bus Company, Inc. ("Logan Bus"), Logan Matron Co., Inc. ("Logan Matron"), Little Linda Bus Co., Inc. ("Little Linda Bus"), Little Linda Matron Co., Inc. ("Little Linda Matron"), and Lin Lis Transportation Corp. ("Lin Lis," and collectively, "defendants") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. , as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381 - 1453.[1] Plaintiffs allege that that *338 defendants are in default under ERISA and the MPPAA for failing to make required withdrawal liability payments to the Fund, and therefore, that defendants are liable to the Fund for withdrawal liability, interest, liquidated damages, attorney's fees, and costs. Defendants filed counterclaims seeking declaratory judgments that (1) plaintiffs' purported notices and demands for withdrawal liability were insufficient under MPPAA section 1399(b)(2), and (2) plaintiffs should be compelled to arbitrate all claims against defendants.
Presently before the Court are motions for summary judgment. For the reasons that follow, the Court grants defendants' motion for summary judgment, denies plaintiffs' motion for summary judgment, and stays this action pending arbitration.
I. BACKGROUND
A. Facts[2]
1. Relevant Entities
The Fund is multiemployer pension plan under ERISA that provides retirement benefits to eligible participants. (Compl. ¶ 2.)
LTSI is a signatory to certain collective bargaining agreements ("CBAs") with the Division 1181 Amalgamated Transit Union ("Local 1181" or "the Union"). (Defs. 56.1 ¶ 1.) At times relevant to this action, LTSI employed individuals represented by Local 1181 for purposes of collective bargaining. (Compl. ¶ 10.) Under the CBAs, LTSI was required to contribute to the Fund on behalf of those employees. (Id. ¶ 12.)
In addition to LTSI, entities Grandpa's Bus Co., Inc. ("Grandpa's Bus"), Lorissa Bus Co., Inc. ("Lorissa Bus"), and Bobby's Bus Co., Inc. ("Bobby's Bus") are also signatories to CBAs with the Union. (Defs. 56.1 ¶ 7.) These four entities act as a single entity for purposes of collective bargaining. (Id. ) They send a single contribution payment check to the Fund every month. (Id. ¶ 8.)
Logan Bus is neither a signatory to CBAs with the Union, nor has it ever contributed to the Fund. (Id. ¶ 2.) Logan Bus, however, is a signatory to a collective bargaining agreement with a different union, and has contributed to that union's pension fund for over 20 years. (Id. )
Defendants, including LTSI and Logan Bus, are 100 percent owned by Lorinda Logan. (Pls. 56.1 ¶ 2.)[3] Lorissa Bus and Bobby's Bus are 100 percent owned by Michael Tornabe, Lorinda Logan's husband (Reece Reply Decl. ¶ 10.) Grandpa's Bus is owned by Lorinda Logan's brother, Richard Logan. (Id. ¶ 9.)
2. LTSI's Contract with the City of New York[4] and Cessation of Contributions to the Fund
On or about April 1, 2013, the City of New York informed LTSI that, effective July 1, 2013, it was terminating LTSI's *339 contract to provide certain busing services. (Defs. 56.1 ¶ 4.) LTSI's work under its contract with the City of New York was the only work for which LTSI made contributions to the Fund. (Pls. 56.1 ¶ 11.) The Fund learned that the City of New York was terminating LTSI's contract, although it is unclear when it became aware of that fact. (Id. ¶ 10.)
In July 2013, LTSI stopped providing busing services under its contract with the City of New York. (Defs. 56.1 ¶ 4.) In or around this time, LTSI also stopped making contributions to the Fund. (Pls. Suppl. 56.1 ¶ 12.) The parties, however, dispute to what extent it was known that LTSI's cessation of contributions to the Fund was only temporary. Plaintiffs assert that the Fund did not have any information at the time LTSI's contract was terminated regarding whether LTSI would resume making contributions to the Fund. (Id. ¶ 13.) Defendants assert that they never stated to the Fund that they had any intention to permanently cease covered operations under the Fund. (Defs. Resp. Pls. Suppl. 56.1 ¶ 13.)
3. The Fund's Approval of Withdrawal Liability Assessments Against LTSI
On December 10, 2013, the Fund's Board of Trustees approved "withdrawal liability assessments and demands for Logan Transportation." (Pearl Decl. Ex. A.) The Fund concluded that LTSI had effectuated a complete withdrawal from the Fund, effective June 30, 2013. (Pls. Suppl. 56.1 ¶ 14.)
4. The Fund's December 12, 2013 Letter
On or about December 12, 2013, Robert D'Ulisse, the Fund Director, sent a "Withdrawal Liability" letter to Logan Bus Company on behalf of the Fund's Board of Trustees. (Pearl Decl. Ex. B.) The letter was addressed to "Logan Bus Company" alone; it was not addressed to a specific individual. (Id. ) The letter states, in relevant part:
To Whom It May Concern:
The Board of Trustees of the Division 1181 A.T.U.-New York Employees Pension Fund (the "Fund") has determined that Logan Bus Company, Inc. (the "Company"), permanently ceased all covered operations under the Fund on or around June 30, 2013. The Board of Trustees has determined that this constitutes a complete withdrawal from the Fund. Pursuant to Section 4202 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980, this letter constitutes Notice that the Board of Trustees has determined that such a withdrawal has created withdrawal liability on the part of the Company to the Fund, and serves as a demand for such payment in accordance with Section 4219(b)(l) of ERISA. Under Section 4001 of ERISA, this liability is owed by the Company and any or all trades or businesses under common control with the Company.
By application of Section 4211(c) of ERISA, the Fund has initially calculated the Company's withdrawal liability to be $2,064,426.00. Under Section 4219(c), the amount due is required to be paid in a single installment of $2,064,426.00 or 56 quarterly installments of $57,951.91 plus a final quarterly payment of $1,359.34.... The first quarterly installment is due to the Fund no later than sixty (60) days from the date of this letter.
Pursuant to Section 4219(a) of ERISA, you are required to furnish, within thirty (30) days, a response to any written request for information from the Fund. In this regard, please furnish to the Fund within thirty (30) days a complete *340 list of each trade or business under common control with the Company, as that term is defined by ERISA Section 4001(b).
(Id. ) Attached to the letter was a document titled "Division 1181 A.T.U.-New York Employees Pension Fund Withdrawal Liability-Logan." (Id. ) The letter provides that the document is "the payment schedule calculation completed by the Fund's actuary." (Id. )
The letter was signed for by a bus driver for Little Linda Bus, who occasionally performed clerical duties, such as picking up the mail at the post office. (Robertson Decl. ¶¶ 1-2, 4.) It was the employee's practice to leave any letter not addressed to an individual next to the office administrator's desk. (Id. ¶ 6.) Neither Christopher Reece, the Controller of Logan Bus, LTSI, and the other defendant entities (Reece Decl. ¶ 1),[5] nor management for Logan Bus or any of the defendant entities received the December 12, 2013 letter from the Fund (id. ¶ 7).
D'Ulisse testified that the December 12, 2013 letter should have been addressed to LTSI, instead of Logan Bus, and that the information in the first sentence of the letter stating that Logan Bus had permanently ceased all covered operations under the Fund was incorrect. (D'Ulisse Dep. Tr. at 36, 71, Pearl Decl. Ex. R.) However, the parties dispute why the letter was sent to Logan Bus in the first instance. Plaintiffs claim that the letter was mistakenly sent to Logan Bus because the Fund's actuary used Logan Bus's name on its withdrawal liability calculation. (Pls. 56.1 ¶ 4.) Defendants contest this explanation and assert that it is inconsistent with the documentary evidence and cannot be reconciled with the Board of Trustees minutes approving withdrawal liability assessment and demands for Logan Transportation. (Defs. Resp. Pls. 56.1 ¶ 4.)
It is undisputed that, prior to the December 12, 2013 letter, the Fund had not sent pension fund letters to "Logan Bus Company" in the ordinary course of business. (Defs. 56.1 ¶ 11.) In addition, the Fund did not, in the ordinary course of business, communicate with LTSI by sending correspondence to Logan Bus. (Id. ¶ 26.) Instead, prior to the December 12, 2013 letter, all communications sent from the Fund to LTSI were addressed to Lorinda Logan or Reece. (Id. ¶ 12.)
It is also undisputed that, in 2013 and 2014, the Fund sent between six and eight withdrawal liability notices to Fund contributories, and, aside from the December 12, 2013 letter sent to Logan Bus, every such letter was addressed to and sent to the contributing signatory employer. (Id. ¶¶ 20-21.)
5. LTSI's Renewed Contributions to the Fund
In or around December 2013, LTSI and the City of New York renewed their contract for busing services. (Id. ¶ 5.) In January 2014, LTSI resumed busing services under the contract (id. ); LTSI also resumed making contributions to the Fund (id. ¶ 6). LTSI continued to contribute to the Fund each month thereafter. (Id. ¶ 6.) The other relevant entities contributing to the Fund-Grandpa's Bus, Lorissa Bus, and Bobby's Bus-made continuous monthly contributions to the Fund, both before and after June 30, 2013. (Id. ¶ 8.)
6. May 2014 Communications
On or about May 9, 2014, counsel for the Fund sent a "Delinquent Withdrawal Liability" letter to Logan Bus. (Pearl Decl.
*341 Ex. F.) Like the December 12, 2013 letter, this letter was addressed to "Logan Bus Company" alone; it was not addressed to a specific individual. (Id. ) The letter states, in relevant part:
To Whom It May Concern:
This firm represents the Division 1181 A.T.U.-New York Employees Pension Fund ("Fund"). By letter dated December 12, 2013 (copy enclosed), the Fund informed Logan Bus Company, Inc. (the "Company") that it had affected a complete withdrawal from the Fund on or around June 30, 2013, and that it owes withdrawal liability in the amount of $2,064,426.00, payable in a single installment of $2,064,426.00, or 56 quarterly installments of $57,951.91, plus a final quarterly installment of $1,359.34.
The letter demanded payment from Logan Bus, plus interest, and warned that failure to "cure this delinquency" would constitute a default under ERISA. (Id. ) The letter also enclosed the December 12, 2013 letter and its attachment. (Id. )
D'Ulisse testified that he realized that the information in the December 12, 2013 letter was incorrect before the May 9, 2014 letter was sent to Logan Bus, and that he told this to the Fund's counsel. (Defs. 56.1 ¶¶ 23-24.)
On May 12, 2014, Reece emailed D'Ulisse regarding the May 9, 2014 letter. (Pearl Decl. Ex. H.) The email states:
Bob, I received the attached letter today stating that Logan Bus had affected a complete withdrawal from the fund. This statement is incorrect as Logan Bus Co. Inc. has never entered into a collective bargaining agreement with Division 1181 A.T.U. Attached for your convenience is our response to the letter. Call me should you have any questions.
(Id. ) The email attached a letter dated May 12, 2014 from Reece to counsel for the Fund on "Logan Bus Company Inc." letterhead. (Id. ) The letter states, in relevant part:
Logan Bus Company received the enclosed letter in the mail today. In summary, it incorrectly states that Logan Bus Company, Inc. has "...affected a complete withdrawal from the fund on or about June 30, 2013..." This is incorrect as Logan Bus Co., Inc. has never entered into a collective bargaining agreement with Division 1181 A.T.U. At no point in time has Logan Bus Company contributed or otherwise participated in the Division 1181 A.T.U.-New York Employees' Pension Fund. Therefore, Logan Bus Co., did not 'withdraw' from the pension fund.
Should you have need for further clarification, please contact Chris Reece .... We look forward to correcting this inaccuracy together.
(Id. )
On May 13, 2014, D'Ulisse responded via email to Reece's email, writing: "Good Morning Chris, Thanks for the information. I believe Logan Transportation System had a collective bargaining agreement with the Union and they went out June 30, 2013. Thanks, Bob." (Pearl Decl. Ex. G.) Reece did not understand D'Ulisse's email to be an affirmative statement that LTSI had withdrawn. (Reece Reply Decl. ¶ 6.) Instead, Reece expected that D'Ulisse would follow up with an affirmative statement. (Id. )
After receiving D'Ulisse's email, Reece called D'Ulisse and left him a voicemail "to call [Reece] back regarding the withdrawal liability issue." (Id. ¶ 7; Defs. 56.1 ¶ 39.) In addition, on May 19, 2014, Reece responded via email to D'Ulisse's May 13, 2014 email writing, "Hi Bob-Give me a call please. I left a voicemail as well." (Pearl Decl. Ex. G.)
*342 7. The Fund's September 12, 2014 Letter
On or about September 12, 2014, counsel for the Fund sent a letter to counsel for defendants. (Pearl Decl. Ex. M.) The letter states that it is responding to Logan Bus's May 12, 2014 letter and follow-up conversations between counsel. (Id. ) In the letter, counsel for the Fund asserts that the Fund's December 12, 2013 letter constituted sufficient notice to LTSI. Specifically, counsel for the Fund asserts that notice to Logan Bus constituted notice to LTSI because both entities are owned by Lorinda Logan and are treated as a single employer for purposes of withdrawal liability. (Id. ) The letter concludes:
Finally, to the extent you seek a formal version of the Fund's December 12, 2013 withdrawal liability demand, this is to state, as you know, that Logan Transportation Systems, Inc. ("LTS"), not Logan Bus, is the entity that was the contributing entity and the one that underwent a complete withdrawal from the Fund. Consequently, the Trustees of the Fund will be filing suit in federal court against Logan Bus, LTS and all other entities within the control group for the full amount of withdrawal liability, as well as interest, liquidated damages, and attorneys' fees and costs.
(Id. )
8. Plaintiffs' Complaint
Plaintiffs commenced this action on October 13, 2014, asserting claims for withdrawal liability against LTSI, as well as the other entities owned by Linda Logan.
9. Defendants' November 25, 2014 Letter
On November 25, 2014, counsel for defendants sent a letter to counsel for the Fund regarding "Logan Transportation Systems, Inc.-Withdrawal Liability-Division 1181 A.T.U.-New York Employees Pension Fund." (Pearl Decl. Ex. J.) The letter states, in relevant part:
This letter is a request that the Trustees of the Division 1181 A.T.U. New York Employees Pension Fund ("the Funds") review the assessment of withdrawal liability against LTSI Pursuant to 29 U.S.C. § 1399(b)(2)(A).
It is [LTSI, its subsidiaries, and affiliated companies'] position that the December 12, 2013 withdrawal liability notice was insufficient as it failed [to] provide actual or constructive notice to LTSI of its alleged complete withdrawal. Furthermore, sufficient notice was not provided until September 2014 whereby in a letter written by your office the Funds for the first time specifically addressed its notice to Logan Transportation Systems, Inc. which has a CBA with Division 1181.
(Id. ) The letter then identified "numerous inaccuracies" with the Fund's notice and demand, specifically disputing whether a complete or partial withdrawal ever occurred, as well as the amount of the withdrawal liability. (Id. ) The letter also requested that the "Funds review and clarify the allegations set forth in their September 2014 notice of withdrawal liability," and demanded "copies of pertinent sections of all Trust Fund Rules and Regulations relevant to arbitration forums and procedures for initiating arbitrations under the plans." (Id. ) The letter enclosed "a first quarterly payment of $57,951.91." (Id. ) Thereafter, LTSI continued to make quarterly withdrawal liability payments, each of which were accepted and deposited by the Fund. (Defs. 56.1 ¶¶ 51, 52.)
Neither the Fund nor its counsel responded to this letter or thereafter sent defendants a copy of the Fund's arbitration rules. (Id. ¶ 50.) However, the Fund had previously sent LTSI a copy of the Fund's Withdrawal Liability Rules, on *343 May 7, 2013. (Pls. Suppl. 56.1 ¶ 1.) The rules state that "arbitration shall be initiated and conducted in accordance with regulations promulgated by the Pension Benefit Guaranty Corporation at 29 CFR § 4221.1 et seq. " (Id. ¶ 2.)
10. Defendants' Counterclaims and Letter to the American Arbitration Association
On December 11, 2014, defendants filed their answer to plaintiffs' complaint, as well as counterclaims for declaratory judgments that (1) plaintiffs' letters prior to September 12, 2014 were insufficient notice of withdrawal liability, and (2) plaintiffs should be compelled to arbitrate all claims against defendants. Defendants attached to their answer and counterclaims copies of the December 12, 2013, May 9, 2014, and September 12, 2014 letters from the Fund, as well as a copy of the November 25, 2014 letter from their counsel. (Id. at Exs. B, C, E, F.)
On or about January 23, 2015, counsel for defendants sent the American Arbitration Association ("AAA") a letter, copying counsel for the Fund, enclosing a "Demand for Arbitration," as well a $75 check for the filing fee. (Pearl Decl. Ex. I.) The "Demand for Arbitration" listed "Division 1181 ATU New York Welfare Fund," instead of the Local 1181, as the respondent, and D'Ulisse as the contact person. (Id. )
Thereafter, the Fund declined to participate in the arbitration, and plaintiffs and defendants agreed to stay the arbitration pending the resolution of this action. (Defs. 56.1 ¶ 48.)
B. Procedural History
As discussed above, plaintiffs commenced this action on October 13, 2014. (ECF No. 1.) On December 11, 2014, defendants answered plaintiffs' complaint and filed counterclaims. (ECF No. 9.) Defendants filed their second amended answer and counterclaims on February 18, 2015. (ECF No. 21.) On March 17, 2015, plaintiffs filed their first motion for summary judgment. (ECF No. 23.) Defendants cross-moved for declaratory judgment on April 17, 2015. (ECF No. 24.) The Court denied both motions without prejudice on January 14, 2016, and directed the parties to conduct discovery. (ECF Nos. 32, 33.)
After completing discovery, plaintiffs filed the instant motion for summary judgment on April 17, 2017. (ECF No. 55.) Defendants opposed plaintiffs' motion and filed a cross-motion for summary judgment on June 9, 2017. (ECF No. 56.) Plaintiffs filed their opposition to defendants' cross-motion and reply in support of their motion on July 31, 2017 (ECF No. 60), and defendants replied on August 28, 2017 (ECF No. 62). The Court heard oral argument on September 14, 2017.
The Court has fully considered the parties' arguments and submissions.
II. STANDARD OF REVIEW
Under Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Gonzalez v. City of Schenectady , 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he or she is entitled to summary judgment. Huminski v. Corsones , 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a *344 genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of West Hartford , 361 F.3d 113, 122 (2d Cir. 2004) (quoting Weyant v. Okst , 101 F.3d 845, 854 (2d Cir. 1996) ); see Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").
Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese , 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ). As the Supreme Court stated in Anderson , "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. at 247-48, 106 S.Ct. 2505. The nonmoving party may not rest upon conclusory allegations or denials but must set forth "concrete particulars" showing that a trial is needed. R.G. Grp., Inc. v. Horn & Hardart Co. , 751 F.2d 69, 77 (2d Cir. 1984) (quoting SEC v. Research Automation Corp. , 585 F.2d 31, 33 (2d Cir. 1978) ). Thus, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co. , 77 F.3d 603, 615 (2d Cir. 1996) (quoting Research Automation Corp. , 585 F.2d at 33 ).
Where, as here, the parties have filed cross-motions for summary judgment, "the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the nonmoving party." Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC , 3 F.Supp.3d 171, 179 (S.D.N.Y. 2014) ; see also Heublein, Inc. v. United States , 996 F.2d 1455, 1461 (2d Cir. 1993) ("[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." (quoting Schwabenbauer v. Bd. of Educ. of Olean , 667 F.2d 305, 314 (2d Cir. 1981) ) ).
III. DISCUSSION
The parties' motions for summary judgment center on two issues: (1) whether plaintiffs notified LTSI of its withdrawal liability under MPPAA section 1399(b)(1) prior to September 2014 (that is, whether plaintiffs' December 12, 2013 letter or May 2014 communications constitute sufficient notice under the statute), and (2) whether defendants initiated arbitration under MPPAA section 1401.[6]
*345 If the Court determines that plaintiffs sufficiently notified defendants of their withdrawal liability prior to September 2014, then plaintiffs are entitled to summary judgment. More specifically, defendants would be in default under ERISA and the MPPAA for failing to respond to plaintiffs' notice and demand or initiate arbitration. Accordingly, the Court would not need to reach the second issue-whether defendants properly initiated arbitration-because defendants would be precluded from initiating arbitration and raising their affirmative defenses to plaintiffs' claims for withdrawal liability.
If, however, the Court determines that defendants' December 12, 2013 letter and May 2014 communications did not constitute notice under section 1399(b)(1), then the Court must decide whether defendants initiated arbitration under section 1401. If the Court determines that defendants properly initiated arbitration, then defendants are entitled to summary judgment and this case must be stayed pending arbitration. Alternatively, if the Court determines that defendants waived their right to arbitrate under the MPPAA, then plaintiffs are entitled to summary judgment because defendants would be in default for failing to timely initiate arbitration.
For the reasons set forth below, based on the undisputed facts in the record, the Court concludes that (1) plaintiffs' December 12, 2013 letter and May 2014 communications did not constitute sufficient notice under section 1399(b)(1), and (2) defendants timely initiated arbitration under section 1401. Accordingly, the parties are ordered to arbitrate any remaining disputes regarding withdrawal liability, and the Court stays this action pending arbitration.
A. Statutory Scheme
Congress enacted the MPPAA in 1980 in response to findings that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co. , 467 U.S. 717, 722, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).
To that end, the MPPAA assesses "withdrawal liability," or the employer's "proportionate share of the plan's unvested benefits," against an employer that withdraws from a multiemployer pension plan. ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc. , 846 F.2d 879, 881 (2d Cir. 1988) (citing 29 U.S.C. §§ 1381, 1391 ).
Under the MPPAA, when an employer withdraws from a multiemployer pension plan, the plan sponsor must (1) "determine the amount of the employer's withdrawal liability," (2) "notify the employer of the amount of the withdrawal liability," and (3) "collect the amount of the withdrawal liability from the employer." 29 U.S.C. § 1382. The plan sponsor is required to notify the employer "[a]s soon as practicable" of the amount of liability and a schedule for liability payments, and demand that the employer pay the withdrawal liability in accordance with the schedule. Id. § 1399(b)(1).
Once an employer receives such notice, it has 90 days to (1) "ask the plan sponsor to review any specific matter relating to the determination of the employer's liability *346 and the schedule of payments," (2) "identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer," and (3) "furnish any additional relevant information to the plan sponsor." Id. § 1399(b)(2)(A). In addition, within 60 days of such notice, the employer must begin paying the plan withdrawal liability, "notwithstanding [the employer's] request for review or appeal." Id. § 1399(c)(2).
If the employer sends the plan sponsor a request for review, the plan sponsor must, after "a reasonable review of any matter raised," notify the employer of its decision, the basis for its decision, and any reasons for changing the employer's liability or schedule of liability payments. Id. § 1399(b)(2)(B).
Disputes between an employer and the plan sponsor concerning withdrawal liability are to be resolved through arbitration. Id. § 1401(a)(1). Arbitration may be initiated by either the employer or the plan sponsor within 60 days after the earlier of (1) the plan sponsor's response to the employer's request for review under section 1399(b)(2)(B), or (2) 120 days after the employer's request for review under section 1399(b)(2)(A). Id. The parties may also jointly initiate arbitration within 180 days of the plan sponsor's notice under section 1399(b)(1). Id.
In the event arbitration is not initiated, the withdrawal liability becomes "due and owing" pursuant to the plan sponsor's schedule, and the plan sponsor may bring a collection action in court. Id. § 1401(b)(1).
B. Notice of Withdrawal Liability
The first issue the Court must decide is whether plaintiffs notified LTSI of its withdrawal liability under MPPAA section 1399(b)(1) prior to September 2014. As noted, the MPPAA requires that plan sponsors, "[a]s soon as practicable after an employer's complete or partial withdrawal," notify the employer of the amount of the liability and schedule for liability payments and demand payment under the schedule. Id. § 1399(b)(1).
Plaintiffs argue that their December 12, 2013 letter to Logan Bus, or alternatively, their May 9, 2014 letter to Logan Bus together with D'Ulisse's May 13, 2014 email to Reece, properly notified defendants of their withdrawal liability. Defendants dispute that these communications constituted sufficient notice. For the reasons set forth below, the Court agrees with defendants that neither the December 12, 2013 letter nor the May 2014 communications constituted sufficient notice under section 1399(b)(1).
1. December 12, 2013 Letter
The Court concludes that the Fund's December 12, 2013 letter was not compliant notice of LTSI's withdrawal liability under section 1399(b)(1). Significantly, the letter does not mention LTSI, the withdrawing employer, once. Instead, the letter states that "Logan Bus Company, Inc.... permanently ceased all covered operations under the Fund on or around June 30, 2013" and "that this constitutes a complete withdrawal from the Fund." (Pearl Decl. Ex. B.) D'Ulisse, the Fund Director, conceded that this statement was incorrect (D'Ulisse Dep. Tr. at 36, 71), and the Court reaches the same conclusion. Logan Bus was neither a signatory to the CBAs with the Union nor a contributor to the Fund (Defs. 56.1 ¶ 2), and thus could not have "ceased all covered operations under the Fund" or withdrawn from the Fund. A substantively inaccurate letter that fails to reference the withdrawing employer (and, instead, references another existing entity) simply does not provide notice to the employer of its purported withdrawal liability.
*347 In addition, the uncontroverted facts surrounding the sending of the December 12, 2013 letter further support that LTSI did not receive notice under section 1399(b)(1). Specifically, the letter was sent to Logan Bus, instead of LTSI (Pearl Decl. Ex. B); the letter was not addressed to any individual, even though it was the Fund's practice to send all correspondence from the Fund to LTSI either to Lorinda Logan or Reece (Defs. 56.1 ¶ 12); neither Reece nor the defendant entities' management received the letter (Reece Decl. ¶ 8); and this is the only withdrawal liability notice letter sent by the Fund during the time period relevant to this action that was not sent to the contributing employer (Defs. 56.1 ¶¶ 20-21). Accordingly, this is not a situation where LTSI received the letter and sat on its rights; instead, plaintiffs' idiosyncratic actions contributed to the lack of notice.
Although plaintiffs acknowledge that the December 12, 2013 letter should have been addressed to LTSI, instead of Logan Bus, they nonetheless argue that the Fund's mistake has no legal effect. For support, plaintiffs rely on ERISA Section 1301(b)(1), which provides that all trades and businesses under common control[7] shall be treated as a single employer. 29 U.S.C. § 1301(b)(1). In short, plaintiffs argue that, because "employer" is statutorily defined to include both LTSI and its entire control group, and Logan Bus is a member of LTSI's control group, Logan Bus was also deemed to have ceased covered operations under and withdrawn from the Fund. The Court disagrees.
Plaintiffs' reading of this provision goes one step too far. Although the Court agrees that section 1301(b)(1) provides that "employer" refers to the contributing employer or its control group as a whole , the provision stops there. It does not follow that "employer" refers to each member of the control group individually. In other words, under no reading of the statute could an entity unilaterally withdraw from a fund that it never contributed to and trigger withdrawal liability for its control group. Accordingly, although it might be accurate to state that LTSI's control group withdrew from the Fund, it would not be correct to state that Logan Bus alone withdrew from the Fund. The December 12, 2013 letter thus was not correct as a matter of law.
Plaintiffs also assert that the December 12, 2013 letter to Logan Bus constitutes compliant notice under the well-settled rule that "[n]otice to one member of the control group is considered as notice to all members." Amalgamated Lithographers of Am. v. Unz & Co. , 670 F.Supp.2d 214, 223 (S.D.N.Y. Nov. 3, 2009) (quoting Trs. of Amalgamated Ins. Fund v. Saltz , 760 F.Supp. 55, 58 (S.D.N.Y. 1991) ). Thus, according to plaintiffs, because the Fund sent a notice of withdrawal liability to Logan Bus, LTSI and the other members of its control group are also deemed to have received such notice.
*348 However, in order for notice to be imputed to all members of a control group, the notice must have been "statutorily compliant." Id. at 223-24. For the reasons set forth above, the December 12, 2013 letter was not compliant under section 1399(b)(1). Accordingly, this argument also fails.
In short, the Court concludes that plaintiffs' letter to Logan Bus incorrectly stating that Logan Bus ceased all covered operations under the Fund did not notify LTSI or its control group that the Fund was demanding withdrawal liability due to LTSI's purported withdrawal from the Fund. Plaintiffs have not identified any case, and the Court is not aware of one, where similar "notice" has been deemed compliant,[8] and the Court declines to hold that such notice is compliant here.
2. May 2014 Communications
The Court also concludes that the Fund's May 2014 communications did not constitute compliant notice under section 1399(b)(1).
As an initial matter, the May 9, 2014 letter suffers from the same deficiencies as the December 12, 2013 letter. Although D'Ulisse realized that the information in the December 12, 2013 letter was incorrect prior to May 9, 2014 and relayed this to the Fund's counsel (Defs. 56.1 ¶¶ 23-24), the Fund inexplicably sent another letter to Logan Bus with the same substantive inaccuracies (see Pearl Decl. Ex. F).
Plaintiffs, however, argue that the May 9, 2014 letter, read in conjunction with D'Ulisse's May 13, 2014 email to Reece, provided defendants with the required information under section 1399(b)(1). Although this is a closer question, the Court ultimately disagrees.
As discussed above, when Reece received the May 9, 2014 letter, he emailed D'Ulisse and attached a letter from Logan Bus to the Fund's counsel explaining that the statement that Logan Bus effected a complete withdrawal from the Fund was incorrect. (Pearl Decl. Ex. H.) In response, D'Ulisse simply wrote: "I believe Logan Transportation System had a collective bargaining agreement with the Union and they went out June 30, 2013." (Pearl Decl. Ex. G.)[9] Although D'Ulisse's email references LTSI, it fails to (1) affirmatively state that LTSI is the entity for which the Fund is demanding withdrawal liability, (2) confirm that the information in the attachment to the December 12, 2013 letter applies to LTSI, or even (3) reference the Fund's letters. Instead, it is an evasive response based on D'Ulisse's subjective belief. It is thus not surprising that Reece expected that D'Ulisse would follow up with an affirmative statement (Reece Reply Decl. ¶ 6), or that Reece reached out again to D'Ulisse both by phone and email (Defs. 56.1 ¶ 39; Reece Reply Decl. ¶ 7). However, without any response from the Fund or its counsel (see Defs. 56.1 ¶ 40), Reece and defendants neither received clarification nor notice.
In sum, the Court concludes that the Fund's December 12, 2013 letter, May 9, *349 2014 letter, and May 13, 2014 email did not adequately notify LTSI or its control group of its purported withdrawal liability. Because the Fund did not further communicate with defendants until September 12, 2014 (see Defs. 56.1 ¶ 40), defendants' November 25, 2014 letter responding to the Fund's notice and demand for withdrawal liability was timely under the MPPAA. See 29 U.S.C. § 1399(b)(2) (employer shall respond to the fund "[n]o later than 90 days after the employer receives" section 1399(b)(1) notice).[10] Accordingly, defendants did not default under the MPPAA by failing to respond to the Fund's notice and demand.[11]
C. Initiation of Arbitration
In light of the Court's conclusion that defendants timely responded to plaintiffs' notice of withdrawal liability, the Court must decide whether defendants are entitled to arbitration. Plaintiffs argue that defendants waived their right to arbitrate because they failed to properly initiate arbitration under the MPPAA. In response, defendants assert that they properly initiated arbitration in their December 11, 2014 answer and counterclaims, and then again in their January 23, 2015 letter to the AAA.[12]
As discussed above, the Fund's rules provide that "arbitration shall be initiated and conducted in accordance with regulations promulgated by the Pension Benefit Guaranty Corporation at 29 CFR § 4221.1 et seq. " (Pls. Suppl. 56.1 ¶ 2.) The PBGC regulations discuss "[i]nitiation of arbitration" in section 4221.3.
With respect to timing, Section 4221.3(a) of the PBGC regulations provides that arbitration may be initiated within the time limits described in Section 1401 of the MPPAA. Here, plaintiffs correctly argue that, because the Fund did not respond to defendants' November 25, 2014 letter, either party had 180 days from the date of defendants' letter, or until May 24, 2015, to *350 initiate arbitration. See 29 U.S.C. § 1401(a)(1)(B).
Section 4221.3(d) is the only other provision that dictates how arbitration is to be initiated under the PBGC regulations. It states, in relevant part:
If the employer initiates arbitration, it shall include in the notice of initiation a statement that it disputes the plan sponsor's determination of its withdrawal liability and is initiating arbitration. A copy of the demand for withdrawal liability and any request for reconsideration, and the response thereto, shall be attached to the notice.
29 CFR § 4221.3(d). Thus, in order to initiate arbitration under the PBGC regulations, the employer need only include in a notice to the plan sponsor that it disputes the plan sponsor's determination of withdrawal liability and is initiating arbitration, and attach a copy of the demand for withdrawal liability and any request for reconsideration. Courts have found letters to plan sponsors that include this information sufficient to initiate arbitration. E.g., Operating Eng'rs' Pension Tr. Fund v. Fife Rock Prods. Co. , No. C 10-697 SI, 2011 WL 227665, at *3 (N.D. Cal. Jan. 24, 2011) ; see also Teamsters-Employers Local 945 Pension Fund v. Waste Mgmt. of N.J., Inc. , Civil No. 11-902 (FSH), 2011 WL 2173854, at *3 (D.N.J. June 2, 2011) (undisputed that employer's letter to fund constituted initiation of arbitration under 29 CFR § 4221.3 ).
The Court concludes that defendants' answer and counterclaims meet these requirements. As an initial matter, they were timely filed within 180 days of defendants' November 25, 2014 letter responding to plaintiffs' notice and demand for withdrawal liability. In addition, they dispute the Fund's determination of its withdrawal liability (e.g. , Countercls. ¶ 18) and attach the Fund's notice and demand for withdrawal liability and defendants' response (id. at Exs. E, F). Finally, the Court also determines that the Fund's counterclaim for a declaratory judgment compelling plaintiffs to arbitrate constitutes a statement initiating arbitration. (See id. ¶¶ 43-50.) Although defendants' counterclaim does not literally state that it is initiating arbitration , the Court is not aware of any authority requiring this exact phrase, and the Court concludes that defendants' counterclaim compelling arbitration is sufficient under section 4221.3.
In addition, assuming arguendo that defendants' answer and counterclaims did not technically "initiate arbitration," the Court would conclude that defendants' cause of action for a declaratory judgment compelling arbitration preserved defendants' right to arbitrate. The Second Circuit has stated that "[i]f a party wishes to seek judicial resolution of its dispute without first submitting to arbitration it should seek declaratory and/or injunctive relief against the imposition of withdrawal liability before the time period to initiate arbitration expires." Levy Bros. Frocks , 846 F.2d at 887. For example, if an entity that receives notice of withdrawal liability disputes that it is an "employer" under ERISA, it could seek declaratory relief in court before initiating arbitration. The Court acknowledges that, in such instances, courts have noted that the party contesting withdrawal liability should seek to stay or enjoin the time to initiate arbitration. See, e.g., IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc. , 788 F.2d 118, 129 (3d Cir. 1986). However, where, as here, a fund initiates a court action for withdrawal liability claiming the employer forfeited its right to arbitrate, a counterclaim disputing this fact and seeking an order compelling arbitration has the same effect. In other words, given that plaintiffs claim that defendants did not timely initiate arbitration, the Court assumes that had defendants formally moved to stay the time period to initiate arbitration, *351 plaintiffs would have contested their motion on this basis, and defendants would have responded seeking the same relief in their counterclaims. Thus, the parties and the Court would be in the same position.
Indeed, this is essentially what transpired following defendants' demand for arbitration with the AAA. As noted above, defendants sent a demand for arbitration to the AAA on January 23, 2015. (Pearl Decl. Ex. I.)[13] Defendants have asserted in their 56.1 statements that "[t]he Fund declined to participate in arbitration [with the AAA] and the parties to this action agreed to stay the arbitration pending the outcome of this lawsuit." (Defs. Initial 56.1 ¶ 13; Defs. 56.1 ¶ 48.)
On May 1, 2015, in response to defendants' initial 56.1 statement (filed in support of defendants' cross-motion for declaratory judgment), plaintiffs stated:
Plaintiffs admit that the Fund has not agreed to arbitrate the dispute and aver that the Fund was under no obligation to do so, as any initiation of arbitration by LTSI was untimely. Plaintiffs further admit that the matter is being held in abeyance by the AAA pending the outcome of this litigation.
(Pls. Resp. Defs. Initial 56.1 ¶ 13; see also Pls. Resp. Defs. 56.1 ¶ 48 (plaintiffs assert same statement is undisputed but immaterial).) Thus, before defendants' time to initiate arbitration had run, plaintiffs acknowledged that they refused to arbitrate with defendants and that the AAA matter was held in abeyance, effectively staying arbitration.
Further, this is not a situation where defendants have failed to take any action. As discussed, defendants sought declaratory relief compelling arbitration and separately submitted a demand for arbitration to the AAA before their time to initiate arbitration expired. In addition, defendants have made timely withdrawal payments in accordance with MPPAA section 1399(c)(2). (Defs. 56.1 ¶ 51.)
In sum, the Court concludes that defendants initiated arbitration under PBGC section 4221.3 through their answer and counterclaims, and, in any event, that defendants have not waived their right to arbitrate under the MPPAA. Accordingly, the parties are directed to arbitrate any remaining issues regarding defendants' withdrawal liability.
IV. CONCLUSION
For the foregoing reasons, the Court grants defendants' motion for summary judgment and denies plaintiffs' motion for summary judgment. This case is stayed pending arbitration.
SO ORDERED.

ERISA and MPPAA sections cited herein refer to sections of Title 29 of the United States Code.

With respect to each motion and the issues raised therein, the Court construes the facts in the light most favorable to the non-moving party. Unless otherwise indicated, where a party's Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record.

Lorinda Logan certified in a Withdrawal Liability Questionnaire submitted to the Fund that she is the 100 percent owner of the defendant entities. (D'Ulisse Reply Decl. Ex. C.) She did not identify Grandpa's Bus, Lorissa Bus, or Bobby's Bus as companies in which she had an ownership interest. (Id. )

Although plaintiffs describe this contract as between LTSI and the New York City Department of Education ("DOE"), rather than the City of New York, the parties appear to be referencing the same contract. Accordingly, when the Court refers to LTSI's contract with the City of New York, it is also referring to what plaintiffs describe as LTSI's contract with the DOE.

Reece is also the Controller of the other relevant entities that contribute to the Fund-Grandpa's Bus, Lorissa Bus, and Bobby's Bus. (See Reece Decl. ¶ 18.)

In their summary judgment submissions, defendants also argue that the Fund's withdrawal liability rules are a nullity because the Fund failed to obtain the required approval from the Pension Benefit Guaranty Corporation ("PBGC"), an entity established to administer and enforce certain ERISA provisions, 29 U.S.C. § 1302(a), when it amended the rules in April 2013. In response, plaintiffs assert that this is an issue for the arbitrator, and only in the event the Court determines that defendants are entitled to arbitration. In addition, plaintiffs also argue that they did not need PBGC approval to amend their rules. The Court need not, and does not, reach this issue in order to decide the instant motions. In addition, the Court agrees with plaintiffs that this issue is reserved for the arbitrator, given that it goes to whether defendants owe withdrawal liability. See 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor ... concerning [withdrawal liability] shall be resolved through arbitration.").

Entities under common control are defined under the statute by the Treasury regulations, 26 CFR §§ 1.414(c)-1 through 1.414(c)-5. Among the defined controlled groups are brother-sister corporations. Brother-sister corporations are defined as two or more corporations (1) where the same five or fewer persons own a controlling interest in each organization, and (2) such persons are in effective control of each organization, taking into account the ownership of each person only to the extent such ownership is identical with respect to each such organization. Id. § 1.414(c)-2(c). Here, it is undisputed that LTSI, Logan Bus, and the other defendant entities are 100 percent owned by Lorinda Logan. (Pls. 56.1 ¶ 2.) Accordingly, defendants are part of the same "controlled group" or "control group."

The most on-point case cited by plaintiffs is Local 807 Labor-Management Pension Plan v. ABC Fast Freight Forwarding Corp. , No. 82 C 3356, 1984 WL 3235 (E.D.N.Y. Mar. 1, 1984). The Court, however, agrees with defendants that this case is distinguishable given that (1) there was no allegation that the withdrawing employer lacked actual notice, and (2) it is unclear whether the court actually determined that notice letters sent to a non-contributing control group member were compliant. Id. at *4. Accordingly, the Court does not find it persuasive here.

D'Ulisse's email does not include any of the statutorily required information for notice under section 1399(b)(1). (Defs. 56.1 ¶¶ 34-36.) Accordingly, his email alone does not constitute notice.

The Court need not, and does not, determine whether the Fund's September 12, 2014 letter constitutes compliant notice, because defendants' November 25, 2014 letter is timely under section 1399(b)(2) regardless of whether defendants were notified of withdrawal liability in the Fund's September 12, 2014 letter or its October 13, 2014 complaint. See Labarbera v. United Crane and Rigging Servs., Inc. , Nos. 08-CV-3274 (DLI)(ALC), 08-CV-3983 (DLI)(ALC), 2011 WL 1303146, at *3 (E.D.N.Y. Mar. 2, 2011) (complaint constitutes sufficient notice under section 1399(b)(1) ).

Defendants argue in the alternative that, were the Court to find that plaintiffs' December 12, 2013 letter or May 2014 communications constituted sufficient notice, they would be entitled to equitable tolling of the time to contest withdrawal liability and demand arbitration. More specifically, defendants assert that plaintiffs acted unfairly and fraudulently in concealing their claim for withdrawal liability against LTSI, whereas defendants acted with reasonable diligence. For support, defendants rely on many of the same facts referenced above by the Court in connection with its determination that there was not compliant notice. In addition, defendants assert that plaintiffs' motive was improper. According to defendants, plaintiffs sought to avoid correcting the December 12, 2013 letter because, had the Fund issued a correction any time after January 2014, it could no longer claim that LTSI completely withdrew from the Fund given that LTSI had resumed making contributions. The Court however need not, and does not, reach this issue, in light of its holding that the Funds' communications prior to September 2014 were not compliant notice.

Defendants also argue that plaintiffs should be estopped from contesting defendants' initiation of arbitration (1) in light of the fact that plaintiffs ignored defendants' request for the Fund's arbitration rules, and (2) because a separate agreement between the Fund and the DOE tolling arbitration with the DOE also tolls arbitration with the defendants. Given the Court's conclusion (discussed infra ) that defendants properly initiated arbitration, the Court need not, and does not, reach these issues.

Plaintiffs argue that this letter did not initiate arbitration under the PBGC regulations because it (1) failed to attach the required documents; (2) named the wrong pension fund; and (3) improperly limited the pool of arbitrators. In their summary judgment submissions, defendants made the same arguments set forth in note 12-namely, that plaintiffs cannot claim that demanding arbitration through the AAA is deficient because (1) plaintiffs did not send defendants the Fund's arbitration rules, and (2) the Fund's tolling agreement with the DOE tolled arbitration with defendants. At oral argument, defendants also argued that plaintiffs waived their right to object to any deficiencies under PBGC section 4221.3(e) because plaintiffs did not raise any objections to this letter until a year and a half later. See 29 CFR § 4221.3(e) ("If a party fails to object promptly in writing to deficiencies in an initiation agreement or a notice of initiation of arbitration, it waives its right to object."). The Court again need not, and does not, decide these issues in light of its conclusion that defendants properly initiated arbitration through their answer and counterclaims.